UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

DOOYANG LIMITED

                                      Plaintiff,          09 CV 1310 (AKH)

-v-                                                       **<u>VERIFIED COMPLAINT</u>**

BLUEFIELD SHIPPING CO., LTD.

                                      Defendant.

-------------------------------------------------------------------x

Plaintiff, DOOYANG LIMITED (hereinafter "DOOYANG"), by its attorneys,

CHALOS & CO, P.C., as and for its Verified Complaint against Defendant, BLUEFIELD

SHIPPING CO., LTD. (hereinafter "BLUEFIELD") alleges upon information and belief as

follows:

JURISDICTION

1.      The Court has subject matter jurisdiction by virtue that the underlying claim

herein is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules

of Civil Procedure and within the admiralty and maritime jurisdiction of this Court under 28

U.S.C. § 1333.

THE PARTIES

2.      At all times material hereto, Plaintiff, DOOYANG, was and still is a foreign

business entity with a principal place of business in Seoul, South Korea.

3.      At all times material hereto, Defendant, BLUEFIELD, was and still is a foreign

business entity.

FACTS AND CLAIM

4.      On or about July 25, 2007, DOOYANG, as disponent owners of the M/V JBU

LEVAN, and BLUEFIELD, as charterers, entered into a time charter party agreement for use of

the Vessel, beginning upon delivery, and for a minimum duration until January 17, 2009 and a maximum duration until March 17, 2009. *A copy of the charter party agreement is annexed hereto as Exhibit 1.*

5.       This charter party agreement for the use of the vessel is a maritime contract.

6.       The charter party provided for payment of hire at the rate of USD $40,500.00 per day, payable every fifteen days in advance.

7.       Redelivery of the Vessel was set for January 21, 2009 at 18:00 GMT.

8.       In summary, the Defendant BLUEFIELD has failed to comply with its obligation to pay hire according to the terms of the charter party agreement.  Specifically, Defendant has outstanding hire for the period of December 19, 2008 through January 21, 2009, and has a total amount undisputedly due and owing to Plaintiff, DOOYANG, of USD $1,108,622.25.  *See January 23, 2009 invoice, attached hereto as Exhibit 2.*

9.       Despite repeated demands for payment, Defendant, BLUEFIELD, has failed, neglected and/or otherwise refused to make payment of said sums due and owing to Plaintiff, DOOYANG.

10.      Pursuant to the terms of the charter party agreement, all disputes arising there under are to be submitted to London arbitration with English law to apply.  Plaintiff has or shortly will commence arbitration after the commencement of this action.

11.      This action is brought in order to obtain jurisdiction over Defendants and also to obtain security for Plaintiff's claims and in aid of London arbitration proceedings.

12.      English law, including but not limited to Section 63 of the English Arbitration Act of 1996, provides that a prevailing party is entitled to interest, costs and legal fees.

13.     As best as can now be estimated, the Plaintiff DOOYANG expects to recover the following amounts in London arbitration from Defendant BLUEFIELD:

|     |                                                                      |              |
| --- | -------------------------------------------------------------------- | ------------ |
| A.  | Principal claim:                                                     | $ 1,108,622.25 |
| B.  | Estimated interest on Principal claim: 3 years at 7.5%, compounded quarterly | $ 276,841.13 |
| C.  | Estimated attorneys' fees:                                           | $ 100,000.00 |
| D.  | Estimated Arbitration cost:                                          | $ 75,000.00  |
|     | **Total Claim:**                                                     | **$ 1,560,463.38** |

14.     Therefore, Plaintiffs' total claim for breach of the maritime contract against Defendant BLUEFIELD is in the aggregate USD $1,560,463.38.

## BASIS FOR ATTACHMENT

15.     Defendant cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but Defendant is believed to have or will have during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to, claimed by, or for the benefit of, the Defendant within this District held by various parties, as garnishees, including, but not limited to, electronic fund transfers.

16.     Defendant is continuously engaged in international shipping and conducts business in U.S. Dollars.  Nearly all companies engaged in the international shipping industry transact business in U.S. Dollars and therefore regularly have assets in New York City.  Dollars are the *lingua franca* of international commerce.

17.     All international U.S. Dollar transfers are processed by intermediary banks in the United States, mainly in New York City.  The Clearing House Interbank Payment System represents that it processes 95% of those transfers.

18.     Plaintiff believes that some of these assets of Defendant, to wit: accounts; bank accounts; monies; charter hire; credits; debts owed to the defendants; effects; payments for bunkers, cargo, goods or services; debts; unmatured debts; bills of lading; payments from the purchasers of cargoes; freight and/or hire payments to or from owners of vessels, or charterers, to, from, or for the benefit of, Defendants and/or Clearing House Interbank Payment System (CHIPS) credits or funds being transferred through intermediary banks, are located in this District in the possession of garnishees, including: ABN AMRO BANK, American Express Bank, Bank of America, Bank of China, Bank of New York, Bank of Tokyo Mitsubishi UFJ Ltd., Barclay's Bank, BNP Paribas SA, Calyon, Calyon Financial, Inc., Citibank N/A, Credit Suisse Securities (USA) LLC, Deutsche Bank, HSBC (USA), JPMorgan Chase Bank, Mashreqbank, Societe Generale, Standard Chartered Bank, UBS AG, U.S. Bank, Wachovia Bank,  and Wells Fargo Bank.


WHEREFORE, Plaintiff prays:

A.     That process in due form of law issue against the Defendant, citing them to appear and answer under oath all, and singular, the matters alleged in the Verified Complaint;

B.     That since the Defendant cannot be found within the District, as set forth in the Declaration of George M. Chalos, and pursuant to Rule B and Rule E of the Supplemental Rules of Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B and

Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of

the Defendant's tangible or intangible property or any other funds held by any garnishees in the

district which are due and owing, or other property of, or for the benefit of, the Defendant, up

to the amount of USD $1,560,463.38 to secure and satisfy the Plaintiff's claims, and that all

persons claiming any interest in the same be cited to appear and pursuant to Supplemental

Admiralty Rule B and Rule E answer the matters alleged in the Complaint;

      C.      That Plaintiff may have such other, further and different relief as may be just

and proper.


Dated: Oyster Bay, New York
      February 13, 2009


                    CHALOS & CO, P.C.
                    Attorneys for Plaintiffs
                    DOOYANG LIMITED

                    By:_____
                    George M. Chalos (GC-8693)
                    123 South Street
                    Oyster Bay, New York 11771
                    Tel: (516) 714-4300
                    Fax: (866) 702-4577
                    Email: gmc@chaloslaw.com

# EXHIBIT 1

# TIME CHARTER

## GOVERNMENT FORM

Approved by the New York Produce Exchange

November 6th, 1913-Amended October 20th, 1921-August 6th,1931-October 3rd,1946

1  This Charter Party, made and concluded in ..... *Seoul, Korea* ..... *25th* ..... day of ..... *July* ..... 19 ..... *2007* ...

2  Between ..... *Dooyang Limited, Seoul, Korea.* .....

3  Owners of the good ..... *Bahamas flag* ..... (Steamship/Motorship). ..... *Mv. " IBU Levun " (Bluefield: Description as per clause 29.) "* ..... of ...

4  of ..... *31,198* ..... tons gross register, and ..... *18,357* ..... tons net register, having engines of ..... *indicated horse power*

5  and with hull, machinery and equipment in a thoroughly efficient state and classed ..... *Lloyds*

6  at ..... *See Clause 29* ..... cubic feet bale capacity and about ..... *53,688* ..... tons of ~~2240 lbs.~~

7  deadweight capacity ~~(cargo and bunkers,~~ including fresh water and stores not exceeding one and one half present of ship's deadweight capacity,

8  ~~allowing a minimum of fifty tons)~~ on a draft of ..... *12.49 meters* ..... feet ..... inches on ..... salt ...

9  which are of the capacity of about ..... tons of fuel, and capable of *maintaining throughout the Charter period* ~~steaming,~~ fully laden, under good weather

10  conditions about ..... *14* ..... knots on a consumption of about ..... *31 metric* ..... tons IFO 380 CST plus about 0.2 metric tons of MDO laden ~~of best Welsh coal-best grade fuel oil-best~~

  ~~grade Diesel oil).~~

11  now,

12  ..... and ..... *Bluefield Shipping Co. Ltd.* ..... Charterers of the City of ..... *Hong Kong.* .....

13     Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  ~~about~~ *period time charter for minimum/maximum 17th JAN 2009 / 17TH MARCH 2009 trading via safe ports, safe anchorages, NAABSA to apply.*

15  *(See also line 70)* ..... within below mentioned trading limits.

16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible

17  for the fulfillment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations.*

18  Vessel to be placed at the disposal of the Charterers, at *dropping last outbound sea pilot 1 safe port world wide within trading area port in Owners*

19  *option any time day or night, Sundays and holiday included. Notice as per clause 43.* .....

20  ~~in such dock at or such wharf or place ( where she may safely lie, always afloat, at all times of tide, except as otherwise provided in Clause No.6,~~

21  ~~as the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in Clause No.5.~~ Vessel on her delivery to be

22  ready to receive *any permissible* with clean-swept hold *(as per Clause 34)* and tight, staunch, strong and in every way fitted for the service, having water ballast, winches and

23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25  dise, ~~including petroleum or its products in proper containers,~~ excluding ..... *as per Clause 50* .....

26  ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk~~

27  ~~all necessary fittings and other requirement to be for account of Charterers)~~ in such lawful trades, between safe port and/or ports in ~~British North~~

28  ~~America and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

29  ~~Mexico, and /or South America~~

30  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand,~~ but excluding ~~Magdalena River, St. Lawrence~~

31  ~~between October 31st and May 15th, Hudson Bay and all unsafe ports also excluding when out of season, White Sea, Black Sea and the Baltic,~~

32  *Trading always within Institute Warranty Limits, always afloat (also see line 70) – exclusions as per Clause 61*

33  *Charterers have the option to break IWL against paying additional premium*

34  as the Charterers or their Agents shall direct, on the following conditions:

35

36    1. That the Owner shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water, and maintain her class and keep
38 the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service ~~with all valid certificates for ports of call~~.

39    2. That ~~whilst on hire~~ the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory and customary and/or recommended by port*
   *authorities* Pilotages, Agencies, Commissions.

40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41 a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this
43 Charter to be for Charterers account. ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~
44 ~~of six months or more~~. *Vessel to have a valid deratization certificate throughout the Charter period.*

45 Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47 for dunnage, they making good any damage thereto.

48    3. ~~That the Charterers at the port of delivery, and the Owners at the port of re-delivery, shall take over and pay for all fuel remaining on board~~
49 ~~the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~......................................................................... ~~tons and not more than~~
50 ..................................................................... ~~tons and to be re-delivered with not less than~~............................ *tons. As per Clause 59*
51 ..................................................................... United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
52 ~~stores, on~~...................................................... ~~summer freeboard, per Calendar Month~~, commencing on and from the day of her deliver, as aforesaid, and at
53    4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of US$ 40,500 daily including over time payable 15 days in advance

54 and after the same rate for any part of a *day month*: hire to continue until  the hour of the day of her re-delivery in like good order and condition, ordinary
55 wear and tear excepted, to the Owners (unless lost) at....*on dropping last outbound sea pilot 1 safe port world wide port in Charterers option any time day or night*......
56 *Sundays  and  Holidays  included  within  trading  limits*.....................  unless,  otherwise  mutually  agreed.  Charterers  are  to  give  Owners  not  less  than  20  *and*  15  days
57 notice of vessel expected date of re-delivery, *and redelivery area, 7 days notice of* and probable port and 5/31/2/11 days redelivery notice...

58    5. Payment of said hire to be made in (as *per Clause 5A*) New York in cash in United States Currency semi-monthly *every 15 days* in advance and for the last half month or
59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day as it becomes
60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62 terers. *The Owners to give Charterers a written notice in case of late hire payment and further to give Charterers 1 banking days grace excluding Sunday and Holidays in order to*
   *rectify such late payment before they are at liberty to exercise their right of withdrawal. If Charterers present a copy of swift message confirming payment by fax or e-mail the*
   *payment will stand as punctual and regular. The Owners shall, without prejudice to the liberty to withdraw, be entitled to withhold the performance of any and all of their*
   *obligations hereunder and shall have no responsibility whatsoever for any consequences thereof, in respect of which the Charterers hereby indemnify the Owners and hire shall*
   *continue to accrue and any extra expenses resulting from such with holding shall be for the Charterers account, without prejudice to any claim they(the Owners)may otherwise have*
   on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63 ~~following, that on which written notice of readiness has been give to Charterers or their agents before 4 p.m. but if required by Charterers, they~~
64 ~~to have the privilege of using vessel at once, such time used to count as hire~~.

65    Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their agents, subject
66 to 2½ % commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67 of such advances.

68    6. That the cargo or cargoes be laden, *trimmed, stowed* and/or discharged in any *safe* dock or at any wharf or place that Charterers or their Agents may
69 direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
70 lie aground. *Owners to allow Charterers to work vessel afloat but safely aground in South America where customary.  See also Clause 61.*

71    7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as the accommodations allow. Charterers~~

74  ~~paying Owners~~ ................................ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are

75  incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense. No passengers allowed.

76      8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77  *Boats equipment*. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78  agency; and Charterers are to load, stow, *and trim, dunnage, lash, secure, tally and discharge* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for

79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

80      9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82      10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of *USD10.00 $1.00* per day. Owners to victual pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85  Clerks, stevedore's Foreman, etc, Charterers paying at the current rate per meal, for all such victualling. *As per Clause 58.*

86      11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, *including speed and grade of hold cleaning*, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the Char-

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the Char-

88  terers, their Agents or supercargo, when required, with a true copy of daily *deck and engine* logs *in English*, showing the course of the vessel and distance run and he con-

89  sumption of fuel.

90      12. That the Captain shall use diligence in caring for the ventilation of the cargo.

91      13. That the Charterers shall have the option of continuing this charter for a further period of *as per Line 14* ..................................

92  .................................................................................................. days previous to the expiration of the first-named term, or any declared option.

93  on giving written notice thereof to the Owners or their Agents, ..................................

94      14. That if required by Charterers, time not to commence before ..................................  *1ˢᵗ January, 2008*,

95  not have given written notice of readiness on or before ..................................  *20ᵗʰ April, 2008. Owners to narrow 10 days spread laycan 20 days prior to 1ˢᵗ layday* ..................  and should vessel

96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.  ~~but not later than 4 p.m. Charterers or~~

97      15. That in the event of the loss of time from deficiency of *crew or stores, default and/or strike of officers and crew men or stores*, fire, breakdown or damages to hull,

98  machinery or equipment,

99      grounding, detention by average accidents to ship or cargo. drydocking for the purpose of examination or painting bottom, or by any other cause

100  preventing the full working of the vessel *due to vessel's fault, the vessel to be placed off hire and*, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced

101  by

102  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence

103  thereof, and all extra expenses shall be deducted from the hire.

104      16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be

105  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,

106  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

107  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the

108  purpose of saving life and property.

109      17. That should and dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three Persons *in London* ~~at New York~~,

110  one to be appointed by each of the parties hereto, and the third by the two so chosen their decision or that of any two of them, shall be final, and for

111  the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men *conversant with shipping*.

    18. That the Owners shall have a lien upon all cargoes, and all sub-freights, for any amounts due under this charter, including General Aver-

    age contributions, and the Charterers to have a lien on the ship for all monies paid in advance and not earned, and any overpaid hire or excess

112 deposit to be returned at once. Charterers will not suffer, nor permit to be constituted, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General average shall be adjusted, stated and settled, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116 York-Antwerp Rules 1974 *in London and any subsequent amendments*, ~~1924 at such port or place in the United States as may be selected by the carrier, and as to matters not~~
117 ~~provided for by these~~
118 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged~~
119 ~~into United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be~~
120 ~~Average agreement or bond and such additional security as may be required by the carrier, must be furnished before delivery of the goods.~~
121 ~~Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage~~
122 ~~and special charges thereon, shall, if required be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.~~
123 ~~Such deposit shall at the option of the carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit~~
124 ~~shall be held in a special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or~~
125 ~~credit balances, if any, shall be paid in United States money.~~
126 ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise,~~
128 ~~the~~ ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any~~
129 ~~sacrifices, losses, or expenses of a general nature that may be made or incurred and shall pay salvage and special charges incurred~~
130 ~~in respect of the~~ ~~goods. If salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if~~
131 ~~such salving ship or ships belonged to strangers.~~
132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder. *Hire not to contribute to General*
133 *Average. English Law to apply. General Average/Arbitration in London.*
133 20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the
134 cost of replacing same, to be allowed by Owners.
135 21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary at least once in every six months, reckoning~~
137 ~~from time of last painting, and payment of the hire to be suspended until she is again in proper state for the service,~~
138 *Vessel will be scheduled for drydock between September 2008/March 2009*
139
140 22. Owners shall maintain the gear *and grabs* (for all derricks) capable of handling lifts up to *as described* ~~three tons~~ also
141 providing *and maintaining* ropes, falls, slings and blocks *as on board.* ~~If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *sufficient light for night work as on board and to maintain same in*
143 *efficient working order, lanterns and oil for* ~~night work, and vessel to give use of electric light when so fitted,~~ but any additional lights over those on board to be at Charterers' expense—the
144 Charterers to have the use of any gear on board the vessel.
145 23. Vessel to work night and day, if required by Charterers, and all *cranes and grabs winches* to be at Charterers' disposal during loading and discharging;
146 ~~seamen to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated~~ in the ship's articles. ~~If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen~~ *crane drivers* to be paid by Charterers. In the event of a disabled *crane(s) and/or grab(s)* ~~which or winches or~~
149 ~~deck winches,~~ Owners to pay for shore engine, or engines, in lieu thereof if required, and pay any loss of time occasioned
150 thereby.

151    24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152    in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels
153    etc." in respect of all cargo shipped under this charter to or from United States of America. It is further subject to Clause 50 the following clauses both
154    of which are to be included in all bills of lading issued hereunder:—

155

156    ————— U.S.A. Clause Paramount —————
157    This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
158    16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
159    any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act.  If any term of this bill of lading
160    be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

161    ————— Both to Blame Collision Clause —————
162    If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
163    Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
164    hereunder will indemnify the Carrier against all loss or liability to the other or non carrying ship or her owners in so far as such loss
165    or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
166    carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
167    owners as part of their claim against the carrying ship or carrier. As per Clause 38

168    25.    The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
169    Drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
170    port or to get out after having completed loading or discharging.

171    26.    Nothing herein states is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
172    navigation of the vessel, *acts of pilots and tugboats*, insurance, crew, and all other matters, same as when trading for their own account.

173    27.    A commission of 2¼  *0.625* per cent is payable to the Vessel and Owners to ... *Mohilick Shipping Co. Ltd.* ......................
174
175    on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

    28 An address commission of  25   per cent payable to.... *Charterers* .................................................. on the hire earned and paid under this Charter.

*Clauses Nos. 5A, 29 to 78, all inclusive, as attached, to be considered fully incorporated herein.*

*This Charter Party is computer generated copy of the NYPE(Revised 3rd October, 1946)form printed under licence from the Association of Ship Brokers & Agents (U.S.A.), Inc.,*
*using software which is the copyright of Strategic software Limited.*

*It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, the insertion of new characters, such*
*characters being clearly highlighted by underlining or use of colour or use of a lager font and marked as having been made by the licensee or end user as appropriate and not*
*by the author.*

Owners :                                                              Charterers :

# RIDER CLAUSES TO

# M/V JBU LEVAN / BLUEFIELD

# CHARTER PARTY DATED 25TH JULY, 2007

**Clause 5A    Hire payment**

With reference to Clause 5, line 58 payment of hire – hire is to be paid to:
INDUSTRIAL BANK OF KOREA, SAMSUNG YEOK BRANCH
SWIFT CODE : IBKOKRSE
IN FAVOR OF DOOYANG LIMITED
A/C NO. : 131-037588-56-00011

Referring to lines 65/67;

(1) Cash money drawn by the Master shall be taken at the offices of the Port Agent or be drawn by the Master from the bank; in the event that the Master requests delivery of cash money at the vessel, all risk involved in arranging and making such delivery of cash money to the vessel shall be borne by Owners;

(2) The estimated value of bunkers on redelivery shall be deducted.

Settlement of the retained funds for the above (2) to be made within 3 months after redelivery in any case. Owners undertake to settle supplemental disbursement account substantiated by vouchers submitted by the Charterers' thereafter promptly after their receipt of the Charterers' invoice.

1st hire + bunkers on delivery value to be paid within 2 banking days after vessel's delivery and Charterers receipt of original Charter Party and relevant invoice in Seoul.

Charterers are entitled to deduct amounts/value of Owners disbursement at ports of call during the currency of this Charter Party as per vouchers. Charterers to provide and send copy of vouchers by fax to Owners prior deducting amounts from hire.

Charterers are entitled to deduct from last hire value of bunkers on delivery. If last hire not sufficient, then ballance from penultimate hire.

## M/V Jbu Levan / Bluefield – C/P dated 25th July, 2007

========================================================

**Clause 29 – Vessel's description – all details about**

MV  JBU LEVAN – TC DESCRIPTION
(REVISED ON 22.05.06)

MV JBU LEVAN - B/C DOUBLE SKIN - BUILT 2006
DWT 53,688 MTS ON 12.49 MTRS SSW - BAHAMAS FLAG
LOA 190/BEAM 32.26 M  TPC ON SUMMER DRAFT 56,386 MT
5 HO HA - CO2 FITTED IN HOLDS
65748.13 CBMGR/63628.83 CBMBL
4 X 36 MT CR / 4 X 13 CBM PEINER DUAL SCOOP GRABS
ABT 14 KN ON ABT 29 MT BALLAST/31 MT LADEN IFO 380 CST + 0,2 MT MDO
IN PORT IDLE: ABT 2.8 MT IFO + 1.2 MT MDO
WORKING: ABT 5.0 MT IFO + 1.2 MT MDO
ALL DETS ABT

| | |
|---|---|
| NAME: | M/V JBU LEVAN |
| EX NAMES: | N/B |
| OWNER: | EUROPEAN MARITIME CORP. |
| FLAG: | MARSHALL ISLANDS |
| PORT OF REGISTRY: | MAJURO |
| OFFICIAL NR: | 2551 |
| CALLSIGN: | V 7 J O 6 |
| YEAR BUILT: | 2006 |
| KEEL LAID: | 21 DECEMBER 2004 |
| LAUNCHED: | 17 DECEMBER 2005 |
| DELIVERED: | 05 APRIL 2006 |
| BUILT BY: | NEW CENTURY SHIPBUILDING CO. LTD (HULL No 0105313) |
| CLASS: | LLOYDS |
| IMO NUMBER: | 9287986 |
| LLOYDS CLASS NUMBER: | 9287986 |
| INMARSAT - C: | Telex: 453846850 |
| MINI-M: | Phone: 00870 764052154 |
| FLEET 77 | Phone: 00870 764597882 |
| | Fax : 00870 764597883 |
| MMSI: | 538002551 |
| L.O.A.: | 190.00 M |
| L.B.P.: | 182.00 M |
| BREADTH (MLD): | 32.26 M |
| DEPTH (MLD): | 17.21 M |
| SUMMER DRAFT (S.W): | 12.490 M, D.W.A.T.:53,688 MT / DISPL: 63,707 MT |
| TROPICAL DRAFT (S.W): | 12.750 M, D.W.A.T.:55,154 MT / DISPL: 65,173 MT |
| TROPICAL FRESH DRAFT: | 13.032 M, D.W.A.T.:55,154 MT / DISPL: 65,173 MT |
| FRESH WATER DRAFT: | 12.772 M, D.W.A.T.:53,688 MT / DISPL: 63,707 MT |
| WINTER DRAFT (S.W): | 12.230 M, D.W.AT. :52,172 MT / DISPL: 62,191 MT |
| F.W.ALLOWANCE: | 802 MM |
| FREEBOARD: | 4744MM (ON SUMMER DRAFT) |
| | |
| T.P.C.: | 56.386mt (on Summer Draft) |
| | 56.177mt (on Winter Draft ) |
| | 56.572mt (on Tropical Draft ) |
| LIGHTSHIP WEIGHT: | 10,008 MT |

*M/V Jbu Levan / Bluefield – C/P dated 25th July, 2007*

====================================================

```
LIGHTSHIP DRAFT:        2.244 M
INTERNATIONAL TONNAGE:   GROSS 31,198.00 / 18,357.00 NET
SUEZ CANAL TONNAGE: GROSS 32,649.57 / 29,321.34 NET
PANAMA CANAL TONNAGE:    VOLUME 103879 M3
HOLD / HATCHES:         5HO / 5HA.
HOLD GRAIN CAPACITY: 65748.15M3 (INCLUDING HATCHES)
HOLD BALE CAPACITY:  63628.83M3 (INCLUDING HATCHES)
HATCH SIZES:            NO. 1, 18.86 M  X 18.26 M
                       NO. 2, 21.32 M  X 18.26 M
                       NO. 3, 21.32 M  X 18.26 M
                       NO. 4, 21.32 M  X 18.26 M
                       NO. 5, 21.32 M  X 18.26 M
```

| HOLD CAPACITIES: | GRAIN | BALE |
|---|---|---|
| | NO.1, 10,647.07 M³ | 10,324.36M³ (EXCL. HATCHES) |
| | NO.2, 13,628.71 M³ | 13,126.32 M³ (EXCL. HATCHES) |
| | NO.3, 12,793.31 M³ | 12,318.15M³ (EXCL. HATCHES) |
| | NO.4, 13,513.38 M³ | 13,014.02M³ (EXCL. HATCHES) |
| | NO.5, 11,802.90 M³ | 11,483.20 M³ (EXCL. HATCHES) |
| TOTAL | 62,385.37 M³ | 60,266.05 M³ (EXCL. HATCHES) |

- **DISTANCES:**  (IFO: 500 MTS , MDO 50 MTS , FW 250 MTS)

- KEEL TO HIGHEST FIXED POINT : 44.8 M

- WATER LINE TO HIGHEST POINT:
  a. LADEN CONDITION =        31.78 M
  b. FULL BALLAST CONDITION  =  36.05 M
  c. LIGHT BALLAST CONDITION = 37.97 M
  d. IN LIGHTSHIP CONDITION  =   42.69 M

- WATER LINE TO TOP OF HATCH COAMING:
  a. LOADED CONDITION =    6.97 M
  b. HEAVY BALLAST CONDITION = 12.47 M
  c. LIGHT BALLAST CONDITION = 15.46 M

- DECK TO TOP OF HATCH COAMING: 1.92 M

- SIDE TO HATCH COAMING : 6.95 M

- BOW TO FRONT OF HOUSE : 161.69 M

- DISTANCE FM TANK TOP TO TOP OF HATCH-COAMING: 19.30 M

- DISTANCE FM TANK TOP TO TOP OF HATCH-COVER IN CLOSED CONDITION: 20.00 M

```
TYPE OF HATCHCOVERS:     MACGREGOR – FOLDING TYPE - MECHANICS
VENTILATION IN HOLDS:    NATURAL
CO2 IN HOLDS:            YES , UNITOR
SMOKE DETECTION IN HOLDS YES , UNITOR
AWWF LADDERS:            YES
```

*M/V Jbu Levan / Bluefield – C/P dated 25th July, 2007*

===============================================================

INCINERATOR:                     TIMTECH OG200 C , 465 KW OR 400000 KCAL/H

VESSEL HAS 2 PERMANENT CEMENT HOLES PER EACH HATCH COVER WITH DIAMETER 600MM LOCATED FORWARD STARBOARD AND AFT PORT SIDE EACH HATCH.

F. WATER GENERATOR:              24MTS/DAY
SUEZ CANAL SEARCH LIGHT :        YES
CEMENT HOLES:                    YES (2 FINDERS LOCATED FRD STBD AND AFT PORT)
BALLAST TANK CAPACITY :          IN TANKS 15,347.7 M3
                                 IN HOLD No 3 12,806.9 M3
                                 TOTAL 28,154.5 M3
HEAVY FUEL TANKS 100 %
INCLUDING SERVICE – SETTLING:    2,156.7 M3
MOD 100 % CAPACITY:              153.21 M3
F.WATER CAPACITY:                400.31 M3
CONSTANTS:                       350 MT (EXCLUDING FRESH WATER)


MACHINERY:
MAIN ENGINE:                     MAN B&W 6S50 MCC
                                 8532 KW AT MCR
                                 122.6 RPM
AUX. ENGINES:                    3 SETS, TYPE DAIHATCU 5DK20
                                 600 KW 100% AT 900 RPM
ALTERNATORS:                     SIEMENS


BUNKER GRADES:
FUEL OIL(IFO)                    380 CST AT 50 DEGREES C NOT EXCEED ISO
                                 DIS8217, 2005 RMG380
DIESEL OIL(MDO)                  MARINE DIESEL OIL NOT EXCEED ISO DIS8217, 2005
DMB


BUNKERS OF DIFFERENT GRADES/QUALITIES/SUPPLIERS NOT TO BE MIXED.

• SPEED / CONSUMPTION:

IN GOOD WEATHER, WINDS NOT EXCEEDING 4 OF BEAUFORT SCALE, SEA STATE NOT EXCEEDING No 3 OF DOUGLAS SCALE AND NO ADVERSE CURRENT.

(LADEN – AT SEA)
ABT 14 KNOTS ON ABT IFO (380CST) 31 MT + MDO 0.2 MT

(IN BALLAST)
ABT 14 KNOTS ON ABT IFO (380CST) 29 MT + MDO 0.2 MT

IN PORT (IDLE)
ABT 2.8 MT/DAY IFO + 1.2 MT/DAY MDO

IN PORT (WWW )
ABT 5.0 MT/DAY IFO + 1.2 MT/DAY MDO

*M/V Jbu Levan / Bluefield – C/P dated 25th July, 2007*

==================================================================

(WHEN ENTERING /LEAVING PORT/IN RESTRICTED WATERS WHEN NAVIGATING IN RIVERS OR CANALS VESSEL'S MAIN ENGINE BURNS MDO).

| | |
|---|---|
| CRANES: | 4 CRANES x 36 MT (AT HOOK HANDLING WITHOUT SELFWEIGHT OF THE GRAB) |
| | NO : 4 SETS |
| | MAKER : TSUJI HEAVY INDUSTRIES CO., LTD. |
| | TYPE: ELECTRO-HYDRAULIC |
| | CAPACITY : 36 MT |
| | SLEWING SPEED:   0.65RPM |
| | SLEWING RANGE:   $360^0$DEGREES |
| | HOISTING SPEED:   25 m/min for cargoes between 15-36 mt |
| | 37 m/min for cargoes less than 15 mt |

LOWERING SPEED:  40
WORKING RADIUS : 28-4.5
LUFFING TIME:    abt.60sec
OUTREACH :
MAX OUTREACH FROM SHIP SIDE : 11.87 m
ELECTRIC SOURCE : main source AC 440V,60HZ,3φ;
             spare heater  AC 220V, 60HZ,1φ

| | |
|---|---|
| GRAB FITTED | : 4 GRABS X 13 M3 |
| GRABS (SPECIFICATION) | : PEINER MOTOR DUAL SCOOP GRABS |
| | TYPE MZGL – 13000 – 6 – B |
| | DEADWEIGHT: 8995 KG. EACH GRAB |

VESSEL'S GRABS ARE ADJUSTABLE AS FOLLOWS:

| | NUMBER OF KICKPLATES | CAPACITY | MAX PERMITTED DENSITY |
|---|---|---|---|
| (1) | 4 | 13.0 M3 | 1.45 T/M3 |
| (2) | 3 | 11.0 M3 | 1.70 T/M3 |
| (3) | 2 | 9.0 M3 | 2.10 T/M3 |
| (4) | 1 | 7.5 M3 | 2.50 T/M3 |
| (5) | 0 | 6.0 M3 | 3.00 T/M3 |

ALLOWABLE CARGO LOAD:

TANKTOPS:
CARGO  HOLD No. 1, 24 mtons/M2
CARGO  HOLD No. 2, 20 mtons/M2
CARGO  HOLD No. 3, 24 mtons/M2
CARGO  HOLD No. 4, 20 mtons/M2
CARGO  HOLD N0. 5, 24 mtons/M2

MAIN DECK:  No.1-5 : 2.48 mtons/$M^2$  Not approved for deck cargo
(except cross decks)
HATCH COVERS: 1.75 mtons/M2

*M/V Jbu Levan / Bluefield – C/P dated 25th July, 2007*
==========================================================
(basis cargo homogenously loaded and uniformly distributed)

TANKTOP DIMENSIONS PER HOLD (AT TANKTOP LEVEL):

HOLD # 1

| | | |
|---|---|---|
| WIDTH (FWD | : | 7.5   MTRS |
| WIDTH (MID) | : | 18.0   MTRS |
| WIDTH (AFT) | : | 23.1   MTRS |
| LENGTH | : | 27.88 MTRS |

HOLD # 2

| | | |
|---|---|---|
| WIDTH (FWD) | : | 23.1   MTRS |
| WIDTH (MID) | : | 23.4   MTRS |
| WIDTH (AFT) | : | 23.4   MTRS |
| LENGTH | : | 31.16 MTRS |

HOLD # 3

| | | |
|---|---|---|
| WIDTH (FWD) | : | 23.4   MTRS |
| WIDTH (MID) | : | 23.4   MTRS |
| WIDTH (AFT) | : | 23.4   MTRS |
| LENGTH | : | 29.52 MTRS |

HOLD # 4

| | | |
|---|---|---|
| WIDTH (FWD) | : | 23.4   MTRS |
| WIDTH (MID) | : | 23.4   MTRS |
| WIDTH (AFT) | : | 23.4   MTRS |
| LENGTH | : | 31.16 MTRS |

HOLD # 5

| | | |
|---|---|---|
| WIDTH (FWD) | : | 23.4   MTRS |
| WIDTH (MID) | : | 18.8   MTRS |
| WIDTH (AFT) | : | 12.2   MTRS |
| LENGTH | : | 29.52 MTRS |

DEBALLASTING SPEED : ABT 14 HOURS
CAPACITY: BALLAST PUMP X 2 SET 700 CU.M/HR
          G.S PUMP X 1 SET –200 CU.M/HR

OWNER'S  P ÷ I CLUB:  "NORTH OF ENGLAND P&I CLUB"

END

Owners confirm that vessel can load a full cargo in three alternate holds as long as class permits.

Owners confirm that vessel is ITF fitted, AHL fitted, ISM accredited and is fully suitable for Charterers intended (including Australian) trade. Owners confirm that vessel is a singledeck selftrimming bulkcarrier with no centerline bulkheads or any obstructions on decks or in holds interferring with loading/discharging operations and/or obstructing the use of bulldozers/payloaders.

Owners to advise if the vessel has cement feeder holes on hatchcovers in which case please advice positions/dimentions/number each hatch.

Charterers have the option to arrange for sufficient cement feeder holes in vessels hatch covers in their time and expence, and this work always to be done to class surveyor's

*M/V Jbu Levan / Bluefield – C/P dated 25ᵗʰ July, 2007*
============================================================

approval. Dimensions of holes/drawing always to be approved by class. All cutting and restoring of holes to be fully supervised/approved by classification surveyor.

Owners agree to perform hosetesting/watertight testing of hatches prior loading.

With reference to speed and consumption, Owners have described the vessel in good faith based on figures of sister vessels, but wish to review figure after 3 months trading. Findings to be inserted in Charter Party.

With reference to grabs, Owners confirm vessel's grabs are able to handle all permissable cargoes under this Charter Party.

## Clause 30
Charterers are not to be responsible for stevedore or other damage to the vessel unless promptly notified in writing by the Master within 24 hours of occurrence of damage, but not after sailing load/discharge port except for hidden damage. At the same time, Master will give similar notice and claim to the party causing the damage and assist the Charterers and their Agents in every way to get settlement from the party causing the damage.
See further in clause 35.

## Clause 31
I) Vessel to work day and night if required by Charterers.

II) Owners warrant that vessel's holds are in good condition and will be so maintained, suitable for carriage of cargoes which require a high degree of cleanliness, such as for instance: grain, alumina, valuable minerals, mineral ores and forestry products.
Vessel's crew to be used for intermediate hold cleaning and crew to do their utmost in cleaning holds as if vessel trading for Owners' own account, however, hold cleaning always without Owners' responsibility, unless failure caused by vessel maintainance. Charterers to pay to the Owners US$600.00 per hold for intermediate hold cleaning. All material used for cleaning including fresh water and chemicals, if required, to be for Charterers' account.

III) Provided shore regulations permit, opening and closing of hatches as required to be done by the crew free of charge to the Charterers.

IV) Charterers agree to pay crew bonus for other extra work attributable to Charterers, such bonus to be agreed directly between Charterers and Master, and paid to Master directly. However, it is clearly understood that the crew shall perform normal work as if vessel was trading for Owners' own account.

Above subject permitted by local regulations.

## Clause 32
In the event of a disabled crane or cranes, or insufficient power to operate cranes, Owners to pay for shore engine or engines in lieu thereof, if required. Off hire and stevedore standby time for any loss of time occasioned thereby or occasioned by breakdown of vessel, its gear or equipment to be for Owners' account. No deduction to be made from hire in case of gear breakdown if no loss of time is incurred as result of shore appliances being used at Owners' expense.

## Clause 33
Charterers to have the privilege of flying their house flag. All expenses including repainting to Owners' colours before redelivery, to be for Charterers' account.

*M/V Jbu Levan / Bluefield – C/P dated 25th July, 2007*

========================================================

**Clause 34**

Vessel to deliver with all holds/cargo compartments clean, dry, free of rust scale and cargo residues and ready in all respects to the satisfaction of the surveyor and/or such other recognised local authority or official as local regulations or shippers may require to receive permitted cargo which the vessel may be required to load. If, on presentation for loading at any or all of the loading port(s) the vessel should fail to pass the above cargo surveyors, then all expenses for cleaning and/or fumigation including cost of labour standing by to be for Owners' account, and the vessel to be off hire from time of failing such surveys until it is in all respects ready to load and survey passed. If some holds/cargo carrying compartments are not accepted, Charterers shall have the option of accepting the vessel with those, which are accepted, and in that case Charterers shall pay hire proportionate to the number of holds/cargo carrying compartments, which have passed survey. However, if thereafter there should be any delay owning to non-acceptance of any hold/cargo carrying compartment vessel shall be wholly off hire until the loading programme can be fully resumed.

**Clause 35**

Prior to delivery and redelivery the parties shall appoint one surveyor who shall conduct a joint on/off hire survey. Cost of survey to be shared equally between the Owners and Charterers. Time for on hire survey to be for Owners' account and off hire survey on redelivery to be for Charterers' time. Minor incidents without consequence to vessel's class are considered normal wear and tear. On redelivery Master's stevedore damage reports to the Time Charterers to be checked against on hire report.

Owners will claim only for damage caused by the stevedore in loading or discharging vessel, when such damage has been duly substantiated by Master's prompt notice of claim in writing to Charterers and/or their Agents, and Master has co-operated fully with Charterers or their Agents in establishing the responsibility of the stevedore concerned, and in getting repairs made by them, prior to or immediately upon completion of the loading and/or discharging of the vessel at the port and at the time of occurrence, except for hidden damage.
See further in clause 30.

**Clause 36**

Owners warrant that the vessel is not blacklisted by Arab countries. Owners warrant that the vessel is eligible for bunkers in the United States of America, its territories and possessions in accordance with U.S. Department of Commerce, Office of International trade, Directive no. 705.

**Clause 37**

Any extra War Risks Insurance premium for hull, machinery and Captain/officers/crew, also war bonus, blocking and trapping, if any, will be for Charterers' account when vessel trades to any permissible area for which such additional premiums and bonuses are applicable. Such premium to be equivalent or less than quoted by Lloyd's.

**Clause 38       Protective Clauses**

New Jason Clause, New Both-to Blame Collision Clause, Conwartime 1993, P&I Bunkering Clause, are all to be incorporated as part of this Charter Party and are to be incorporated in all Bills of Lading.

US/Canadian Clause Paramount and Hague-Visby Rules to be included in all Bills of Lading.

*M/V Jbu Levan / Bluefield – C/P dated 25ᵗʰ July, 2007*
=========================================================

**Clause 39**
In the event of the outbreak of war (whether there be a declaration of war or not) between any two or more of the following countries:

UK, USA, PRC, Russia, France, Croatia and Norway,

either the Owners or the Charterers may cancel this Charter Party. Whereupon, the Charterers shall redeliver the Vessel to the Owners in accordance with Clause 10; if she has cargo on board, after discharge thereof at destination, or, if debarred under this Clause from reaching or entering it, at a near open and safe port as directed by the Owners; or, if she has no cargo onboard, at the port at which she then is; or, if at sea, at a near open and safe port as directed by the Owners. In all cases hire shall continue to be paid in accordance with Clause 11 and except as aforesaid all other provisions of this Charter Party shall apply until redelivery.

**Clause 40**
Charterers have the right to use the vessel's wireless station or telex for despatch and receipt of cables and e-mail. See Clause 58.

**Clause 41**
The Charterers shall have the right to order the laying-up of the vessel at any time and any period of time at a safe berth, and in the event of such lay-up, the Owners shall promptly take steps to effect all the economies in operating costs including insurance, which may be possible and give prompt credit to the Charterers in respect of all such economies. At the request of the Charterers, at any time, the Owners shall furnish an estimate of the economies which would be possible in the event of a laying-up of the vessel less any expenses incurred in laying-up including cost of repatriating crew and return on board when vessel will leave the lay-up.

**Clause 42**
Charterers have the option to order the vessel to load at Kenai, Alaska with reasonable advance notice, subject to Owner's approval but such approval not to be unreasonably withheld. Charterers guarantee that the vessel will not be ordered to any load port or area where there is ice. Any extra insurance to be for Charterers' account.

**Clause 43     Notice on delivery**
Owners to keep Charterers closely advised of vessel's expected delivery dates, and shall give a 25/20/15/10/7/5/4/3/2 and 1 day(s) notice of delivery date and place.

**Clause 44**
If the vessel is boycotted, picketed, blacklisted or if any similar incident occurs at any port or place by shore and/or port labours, and/or tugboats, and/or pilots or by government and/or any authority, by reason of the vessel's flag/registry/manning or ownership or terms and conditions on which members of the officers/crew are employed, all consequences and any extra expenses incurred there from to be for Owners' account and the Charterers are entitled to place the vessel off hire for any time lost by such reasons.

**Clause 45**
Charterers to have the benefit of any return Insurance Premium received by Owners from Underwriters (as and when received from Underwriters) by reason of the vessel being in port for a minimum period of 30 days, provided the vessel is on hire.

*M/V Jbu Levan / Bluefield – C/P dated 25ᵗʰ July, 2007*
=========================================================

**Clause 46**

Vessel, cargo gear and grabs and all other equipment shall comply with the regulations of the countries in which vessel will be employed and Owners are to ensure that the vessel is at all times in possession of valid and up-to-date certificates of Efficiency to comply with such regulations. If stevedores, longshoremen or other workmen are not permitted to work due to failure of Master and/or Owners and/or Owners' Agent to comply with the aforementioned regulations, or because vessel is not in possession of such valid up-to-date Certificate of Efficiency, the Owners to pay all extra expenses incurred incidental to and resulting from such failure, and hire shall cease until vessel is in a position to comply with aforementioned regulations.

**Clause 47**

Vessel is suitable for carrying full cargoes of heavy grain and/or oil seeds and/or grain or oil seed products in bulk in all holds without requiring any shifting boards. For the carriage of grain and/or oil seeds in bulk, vessel to have on board at any time of this Time Charter period valid documents and certificates issued by vessel's classification society on the basis of SOLAS 1974 regulations. Vessel may load bulk grain, oil seeds and/or grain/oil seed products with one slack hold subject to stowage factor over 42 cubic feet per long ton and according to grain loading information booklet on board authorised by vessel's classification society, without any securing arrangements.

**Clause 48**

Cost of obtaining Certificate of Financial Responsibility for trading U.S.A to be for Owners' account.

**Clause 49**

Vessel has neither stanchions nor lashing materials on board for loading of deck cargo. If required, Charterers to supply all lashing materials at their time and expenses. Charterers have the option to load cargo on deck and/or hatch covers which to be loaded in accordance with vessel's stability, seaworthiness and strength under Master's supervision. Relevant Bills of Lading contain following clause:

Shipped on deck/hatch covers at Charterers' risk and expenses. Neither the vessel nor her Master nor her Owners is responsible for any cargo damages or loss of cargoes howsoever caused.

Charterers will be responsible (for time and cost) for any repairs of the deck structure caused by cargo on deck.

**Clause 50**          **Cargo Exclusions**

Arms, ammunition, explosives, and/or combustible and/or inflammable and/or injurious cargoes, acids, asphalt and/or its products, ammonium nitrate, however ammonium nitrate fertilizer grades to be allowed, ammonium chlorine, asbestos, bitumen, bulk pyrites, bones, borax though maximum 2 holds of borax to be allowed but not as first cargo and hold cleaning always at Charterers' risk/time and expense, boycott cargoes, charcoal, calcium carbide, carbide hypochlorite, carbide, caustic soda, car vehicles, clay in bulk, however bagged clay to be allowed, cocoa, coffee, cotton, copra and/or its products, corrosives, cotton seed expellers, creosoted goods, direct reduced iron, ferrosilicon, silicon manganese, fish meal, fluorspar, gasoline, hides, hot briquetted iron, hypochlorite solutions, logs, livestock, locomotives, motor spirits, manioc and/or manioc pellets, naphtha, nefiline syenite, Niger seeds, nitrate of soda, oil cakes, oily pieces, oily expellers, organic peroxides, pond coal, potassium chloride, petroleum, petroleum derivates and all its products, pesticides, pitch

*M/V Jbu Levan / Bluefield – C/P dated  25th July, 2007*
==========================================================

pollard pellets, quebracho, radioactive and/or nuclear products and/or its wastes, radioisotopes, resins, scrap, motor blocks, turnings, salt sunflower seed expellers, sulphate in bulk, sponge iron, tar, turpentine, zinc ashes, rice in bulk and IMO class cargoes 1 and 7.

Concentrates are to be allowed, however these products are to be loaded, stowed, discharged in accordance with IMO and local regulations.

Maximum one cargo of limestone.

Only two cargoes (5 holds) of sulphur per year to be allowed under this Charter Party.

Maximum one cargo per year of soda ash to be loaded under this Charter Party.

Maximum three cargoes of Cement/Clinker per year.
Maximum one cargo per year of ammonium sulphate to be allowed under this Charter Party.

Bulk rice for human consumption to be allowed.

Yachts to be allowed to be carried as project cargo on deck and shipped as normal deck cargo (or on hatches) which to be loaded in accordance with ship's stability, seaworthiness, and strength under Master's supervision with responsibility to Owners.

Charterers to be allowed to carry three cargoes per year of salt in bulk.
Lime washing and removal of same to be for Charterers' time and account.

Charterers to be allowed to carry one hold per year of Ferro silicon – the cargo to be carried in accordance with IMO regulations and all material required for carrying same to be for Charterers account.

Charterers to have the option to carry silicon manganese, always in accordance with IMO regulations and necessary material/equipment needed to be for Charterers' account.

Charterers to be allowed to carry maximum two cargoes per year of HMS scrap 1&2 or shredded scrap.

Scrap to be allowed under following conditions:

First layer of cargo scrap not to be released until touching tank top and not to be dumped/dropped during loading.

First layer of scrap to be loaded with sufficient depth to form a cushion and to be evenly stowed/trimmed to satisfaction of Master of the vessel before loading balance of cargo, thus providing a proper cushion prior to loading.

Both Charterers and stevedores to follow the direction of Master at any time when scrap is loaded.

Short Haul Trading:
Charterers have the option to perform maximum 4 consecutive short haul/coastal voyages including aggregates.

*M/V Jbu Levan / Bluefield – C/P dated 25ᵗʰ July, 2007*

========================================================

Logs:
Charterers are allowed to carry pulp-logs in bundles of maximum 5 metric tons/bundles in holds and/or deck.

**Clause 51**
Any time lost and/or expenses or fines incurred on account of attempted or actual smuggling by vessel's officers and crew to be for Owners' account, including consequential damages due to arrest of officers or crew.

**Clause 52**
Charterers to have the option of adding any off hire periods to the period of this Charter Party declarable latest 30 days prior expiry of original period.

**Clause 53          Holds on redelivery**
Vessel to be redelivered with clean swept holds or in Charterers' option with unclean holds against paying US$4,500.00 lumpsum in lieu of cleaning, excluding dunnage, lashing materials removal/disposal.

**Clause 54**
If the vessel deviates or puts back whilst on voyages or there is any loss of time caused by accident or illness to officers or crew or any person on board the vessel, other than persons travelling by request of Charterers, or by reason of the officers or crew being unable to perform their duties, vessel to be off hire for time lost and cost of fuel consumed and other expenses up to when vessel is again in the same position or equivalent, to be for Owners' account.

**Clause 55**
Charterers or their agents are authorizes to issue and sign Bills of Lading on Owners' and Master's behalf on Charterers' usual form for cargo as presented, but always in conformity with Mate's Receipt. Charterers to indemnify Owners against any consequences of Master, Charterers or their Agents signing and issuing Bills of Lading as aforesaid.

In case original Bill(s) of Lading not available at discharge port, Owners agree to release the entire cargo against a single Letter of Indemnity (as per Owners' P&I club wording) signed by one authorised officer of Charterers only.

**Clause 56**
Owners to maintain a full P&I entry during this Charter Party, and Charterers to have the benefit thereof as rules permit.

The responsibility for cargo claims to be settled in accordance with inter-Club New York Produce Agreement (as amended 1996), but the one-year time limit not to apply.

**Clause 57**
It is understood and agreed that in case the vessel does not prove capable of maintaining the speed as described in line 10 of the Charter Party, the Owners shall be allowed to set off against Charterers' claim for loss of time any value of bunkers saved in relation to the same description.

**Clause 58          Cables/victualling/entertainment**
With reference to clauses 10 and 40, in order to eliminate work load of both Owners and Charterers, Owners to settle these accounts as their Own expenses for meal expenses/cable

*M/V Jbu Levan / Bluefield – C/P dated 25th July, 2007*

=========================================================

and telex expenses/representation expenses for the Charterers' account provided the Charterers to pay to the Owner US$1,100.00 per month/pro rata in lieu thereof.

**Clause 59**          **Bunkers**
Intended bunkers on delivery about 720/800mt IFO and about 110/130mt MDO. Bunker prices USD 350/650 per metric ton for IFO/MDO. Quantities on redelivery about same as on delivery. Bunker prices to be based on nearest Platt's bunkering port both ends.

Value of bunkers on delivery to be paid together with first hire. Charterers to have the right to bunker the vessel for their own account prior to delivery in to this Time Charter provided not interfering with operations. Owners to have the same right prior to redelivery.

RME 25 is not available in South Africa and South America, so Charterers option to stem grade RMF 25 available.

**Clause 60**
All taxes and/or dues on vessel, cargo, freight and/or charter hire customarily paid by Charterers to be for Charterers' account. All taxes and/or dues customarily paid by Owners including those, if any, levied on charter hire by vessel's country of registry and/or domicile to be for Owners' account.

**Clause 61**          **Trading exclusions**
World wide trading within Institute Warranty Limits via safe berth(s), safe port(s), safe anchorage(s), always afloat, excluding: Cuba, Lebanon, Syria, Libya (including Gulf of Sidra/Sirte), Ethiopia, Liberia, Zaire, Angola (including Cabinda), Haiti, Somalia, Russian Pacific ports, Cambodia, North Korea, war zone and/or war risk zones, declared war like or unsafe by Owners' underwriters.
Any additional premium declared by vessel's underwriters for ports called, during the currency of this Charter Party to be for Charterers' account. Charterer's option to breach Institute Warranty Limits against paying all extra insurance premium. Vessel not to break nor force ice and not to follow icebreaker.

**Clause 62**
G.M.T. time to be used both for delivery and redelivery, however, only for the purpose of calculating hire.

**Clause 63**
Vessel to be left in seaworthy trim for shifting between berths and/or ports under this Charter Party.

**Clause 64**
Customary quarantine time and expenses to enter the port to be for Charterers' account.

**Clause 65**
Master/Vessel has the liberty to burn MGO for main engine when manoeuvring in shallow/narrow waters/canals/rivers and in or out of ports.

**Clause 66**
Charterers to pay for barge transportation of supplies after a period of 30 days at stay of anchorage.

*M/V Jbu Levan / Bluefield – C/P dated 25ᵗʰ July, 2007*
====================================================================

**Clause 67**
Charterers to have the option of welding pad eyes at their own arrangement and expense. Charterers to remove all pad eyes before redelivery unless Owners request Charterers to maintain same without removal, in which case Charterers will be free from removing pad eyes. Removal has to be to Master's satisfaction and Charterers have to repair any damage to the deck structure and/or paint, due to the welding and to the removal of pad eyes.

**Clause 68**
Charterers have the option to slow speed the vessel at any speed acceptable to the vessel's machinery and seaworthiness.

**Clause 69**
It is understood that specifications of bunkers supplied throughout the duration of this Charter Party always to be within the specifications of quality stipulated in the vessel's description.

**Clause 70**
The Charterers may supply an independent weather routing company's advice to the ship's Master during the currency of this Charter Party. The Master shall comply with the reporting procedure of the routing service selected by the Charterers. Evidence of weather conditions shall be taken from vessel's deck logs and weather routing company report. If any discrepancy, the report from the weather agency to be taken as ruling.

**Clause 71**
In case crane drivers are employed by Charterers for discharging operations, the Owners shall allow same to stay onboard during discharge and cater same against Charterers paying US$10.00 per man per day.

**Clause 72**      **ISM Clause (Bimco Standard ISM Clause):**
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account.

**Clause 73**
In the event that Charterers have a contractual or statutory right of lien over cargo carried on board for hire, freight, deadfreight or demurrage, Owners shall co-operate with Charterers in exercising a lien over the cargo and shall retain possessions of the cargo on their behalf and deal with the cargo on Charterers' instructions, Charterers indemnifying Owners for any loss or damage Owners may suffer following Charterers' instruction.

**Clause 74**      **ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005**
**(a)(i)** The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall

*M/V Jbu Levan / Bluefield – C/P dated 25th July, 2007*

===========================================================

also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

**(ii)** Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

**(iii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

**(b)(i)** The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where subletting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners".*

**(ii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

**(c)** Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

**(d)** If either party makes any payment, which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

*Footnote: This Clause replaces previously published ISPS Clause for Time Charter Parties AND the US Security Clause for Time Charter Parties, both of which are now officially withdrawn.*

**Clause 75       Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005**
**(a)** Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

*M/V Jbu Levan / Bluefield – C/P dated 25th July, 2007*
=======================================================

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii) the Vessel shall be able to consume fuels of the required sulphur content
when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

## Clause 76
### U.S. Customs advance notification / AMS clause for Time Charter Parties

a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);

ii) Have in place an ICB (International Carrier Bond);

iii) Provide the Owners with a timely confirmation of i) and ii) above; and

iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and /or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

c) If the Charterers ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any Bill of Lading, other contract, law or regulation.

## Clause 77
Vessel's next dry-docking is due September 2008/March 2009. Owner's preference is to dry-dock her close to this date. Place/time of dry-docking to be mutually agreed between Owners and Charterers.

## Clause 78
All negotiations and eventual fixture to be kept strictly private and confidential.

# EXHIBIT 2

# *DOOYANG LIMITED*

| TO | BLUEFIELD | | ATTN | MOBIDICK SHIPPING |
|---|---|---|---|---|
| DATE | 23-Jan-09 | | | |
| SUBJECT | MV. JBU LEVAN / BLUEFIELD | | | |

PLEASE BE ADVISED OF CHTRS' PRELIMINARY S.O.A. AS FOLLOWS:

| | | | | | |
|---|---|---|---|---|---|
| DELIVERY : | 2008-04-08  4:25 GMT | IFO : | 665.788 | MDO : | 86.900 |
| REDELIVERY : | 2009-01-21  18:00 GMT | IFO : | 718.300 | MDO : | 27.300 |
| DURATION : | 288.56597 DAYS | IFO PRICE : | $350.00 | MDO PRICE : | $650.00 |
| HIRE : | $40,500.00 DIOT | ILOHC : | $4,500 | G.B.B | |
| ADCOMM : | 2.50% | CAB/ENT/VIC : | $1,100 | P/MONTH OR PRO RATA | |

(UNIT : US$)

| DESCRIPTION | | | | | DR | CR |
|---|---|---|---|---|---|---|
| - TTL HIRE | | | | | | 11,686,921.87 |
| $40,500.00 X  288.565972 DAYS | | | | | | |
| - 2.5% ADCOMM | | | | | 292,173.05 | |
| | | | | | | |
| - B.O.D | | | | | | 289,510.80 |
| IFO: | 665.788 MT | X | $350.00 | = | 233,025.80 | |
| MDO: | 86.900 MT | X | $650.00 | = | 56,485.00 | |
| - VAT ON B.O.D | | | | | | 28,951.08 |
| | | | | | | |
| - B.O.R | | | | | 269,150.00 | |
| IFO: | 718.300 MT | X | $350.00 | = | 251,405.00 | |
| MDO: | 27.300 MT | X | $650.00 | = | 17,745.00 | |
| - VAT ON B.O.R | | | | | 26,915.00 | |
| | | | | | | |
| - INTERMEDIATE H/C after STEEL PRODUCTS | | | | | | 3,000.00 |
| - INTERMEDIATE H/C after FERTILIZER | | | | | | 3,000.00 |
| - INTERMEDIATE H/C after IRON ORE | | | | | | 3,000.00 |
| - INTERMEDIATE H/C after IRON ORE | | | | | | 3,000.00 |
| - INTERMEDIATE H/C after CEMENT | | | | | | 3,000.00 |
| - INTERMEDIATE H/C after BAUXITE | | | | | | 3,000.00 |
| - INTERMEDIATE H/C after IRON ORE | | | | | | 3,000.00 |
| - INTERMEDIATE H/C after COAL | | | | | | 3,000.00 |
| - ILOHC | | | | | | 4,500.00 |
| | | | | | | |
| - AP CHARGE for CALLING NIGERIA | | | | | | 285,000.00 |
| - AP CHARGE for CALLING DAMMAN | | | | | | 7,000.00 |
| | | | | | | |
| - CABLE/ENT/VIC | | | | | | 10,580.75 |
| $1,100.00 X  288.565972 DAYS/ | | 30.00 DAYS | | = | 10,580.75 | |
| - REMITTED HIRE TO OWNERS | | | | | 10,639,604.21 | |
| | 1 HIRE | 925,624.38 | | | | |
| | 2 HIRE | 592,862.50 | | | | |
| | 3 HIRE | 592,862.50 | | | | |
| | 4 HIRE | 595,862.50 | | | | |
| | 5 HIRE | 592,862.50 | | | | |
| | 6 HIRE | 595,862.50 | | | | |
| | 7 HIRE | 581,562.50 | | | | |
| | 8 HIRE | 555,989.61 | | | | |
| | 9 HIRE | 595,862.50 | | | | |
| | 10 HIRE | 592,862.50 | | | | |
| | 11 HIRE | 592,862.50 | | | | |
| | 12 HIRE | 592,862.50 | | | | |
| | 13 HIRE | 595,862.50 | | | | |
| | 14 HIRE | 592,862.50 | | | | |
| | 15 HIRE | 595,862.50 | | | | |
| | 16 HIRE | 880,862.50 | | | | |
| | 17 HIRE | 566,215.22 | | | | |
| | BAL HIRE | 0.00 | | | | |
| **SUB TOTAL** | | | | | 11,227,842.26 | 12,336,464.51 |
| **BALANCE DUE TO OWNERS** | | | | | 1,108,622.25 | |
| **GROSS TOTAL** | | | | | 12,336,464.51 | 12,336,464.51 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

DOOYANG LIMITED

                                        Plaintiff,                          09 CV

-v-
                                                                   **VERIFICATION OF**
                                                                   **COMPLAINT**

BLUEFIELD SHIPPING CO., LTD.
                                        Defendant.
-------------------------------------------------------------------x

        Pursuant to 28 U.S.C. §1746, GEORGE M. CHALOS, Esq., declares under the penalty of

perjury:

    1.    I am a Member of the law firm of CHALOS & CO, P.C., counsel for the Plaintiff,

DOOYANG LIMITED, herein;

    2.    I have read the foregoing Verified Complaint and know the contents thereof; and

    3.    I believe the matters to be true based on documents and information obtained from

employees and representatives of the Plaintiff through its agents, underwriters and attorneys.

    4.    The reason that this verification was made by deponent and not by the Plaintiff is

because Plaintiff is a foreign corporation, whose officers are not in this district, and whose

verification cannot be obtained within the time constraints presented by the circumstances of this

case.

    I declare under penalty of perjury that the foregoing is true and correct.

Dated:  Oyster Bay, New York
        February 13, 2009

                      CHALOS & CO, P.C.
                      Attorneys for Plaintiff
                      DOOYANG LIMITED

        By:    _____
                      George M. Chalos (GC-8693)
                      123 South Street
                      Oyster Bay, New York 11771
                      Tel: (516) 714-4300
                      Fax: (866) 702-4577
                      Email: gmc@chaloslaw.com